## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

KATHLEEN SMITH NORTON,          :
                                :
            Plaintiff           :       No. 3:15-CV-0256
                                :
      vs.                       :       (Judge Nealon)
                                :
CAROLYN W. COLVIN, Acting       :
Commissioner of Social Security, :
                                :
            Defendant           :

FILED
SCRANTON

MAR 3 1 2016

Per_____
DEPUTY CLERK

## MEMORANDUM

On February 5, 2015, Plaintiff, Kathleen Smith Norton, filed this instant appeal[1] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 1461 et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons set forth below, the decision of the Commissioner denying Plaintiff's applications for DIB will be affirmed.

_____

1. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

## BACKGROUND

Plaintiff protectively filed[2] her application for DIB on January 30, 2012, alleging disability beginning on January 26, 2012 due to Rheumatoid Arthritis ("R.A."), degenerative joint damage, Irritable Bowel Syndrome ("IBS"), chronic fatigue, an ulcer, diverticulitis, depression, a hiatal hernia, acid reflux, and skin cancer. (Tr. 11, 154).[3]  The claim was initially denied by the Bureau of Disability Determination ("BDD")[4] on May 2, 2012. (Tr. 11).  On May 14, 2012, Plaintiff filed a written request for a hearing before an administrative law judge. (Tr. 11). A hearing was held on April 12, 2013 before administrative law judge Jarrod Tranguch, ("ALJ"), at which Plaintiff and an impartial vocational expert, Carmine Abraham, ("VE"), testified. (Tr. 11).  On July 30, 2013, the ALJ issued a decision denying Plaintiff's claims because, as will be explained in more detail infra, Plaintiff could perform light work with limitations. (Tr. 11-21).

---

2. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits.  A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

3. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on May 7, 2015.  (Doc. 9).

4. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

On August 19, 2013, Plaintiff filed a request for review with the Appeals Council. (Tr. 7). On January 13, 2015, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on February 5, 2015. (Doc. 1). On May 7, 2015, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 8 and 9). Plaintiff filed a brief in support of her complaint on July 24, 2015. (Doc. 13). Defendant filed a brief in opposition on August 24, 2015. (Doc. 14). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on October 8, 1963, and at all times relevant to this matter was considered a "an individual closely approaching advanced age."[5] (Tr. 150). Plaintiff completed one (1) year of college, obtained her certified nurse's assistant degree, and can communicate in English. (Tr. 153, 155). Her employment records indicate that she previously worked as a certified nurse's assistant at a Veteran's Center from 1994 through January of 2012. (Tr. 164). The records of the SSA reveal that Plaintiff had earnings in the years 1980

5. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. 404.1563(d).

3

through 1985 and 1988 through 2011. (Tr. 126). Her annual earnings range from

a low of no earnings in 1986 and 1987 to a high of thirty-seven thousand four

hundred dollars and fifty-four cents ($37,400.54) in 2010. (Tr. 126). Her total

earnings during those thirty-two (32) years were five hundred forty-three thousand

eighty dollars and sixty cents ($543,080.60). (Tr. 126).

In a document entitled "Function Report - Adult" filed with the SSA on

March 2, 2012, Plaintiff indicated that she lived in a house with her husband. (Tr.

174). When asked how her illnesses, injuries or conditions limited her ability to

work, she stated:

> Have difficulty with extensive walking, prolonged standing,
> stooping, pushing, pulling, reaching, lifting, bends, kneeling,
> twisting and grasping. I have severe R.A. which is
> deteriorating my joints. I have been a CNA for 32 years, 14
> years private sector, 18 years with the Commonwealth of PA. I
> have severe fatigue because of condition and severe pain.

(Tr. 75). She was able to perform light housework, had no problem with personal

care, was able to make dinner for one (1) hour and cooked daily with aid from her

husband due to pain in her hands, did laundry with the assistance of her husband,

was able to drive a car alone, shopped in stores for groceries and clothing, (Tr.

175-177). When asked to check items which his "illnesses, injuries, or conditions

affect," Plaintiff did not check talking, hearing, memory, understanding, following

4

instructions, or getting along with others. (Tr. 179). She stated that she was only able to lift objects under ten (10) pounds, that bending, standing, kneeling, and using the stairs bothered her knees, and that it took a longer time to do housework because her hands would go numb. (Tr. 179). She could walk for twenty (20) minutes before needing to stop and rest. (Tr. 179). She was prescribed a left knee brace by a physician. (Tr. 180).

Regarding her concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, to take her medicine, or to go places. (Tr. 176, 178). She could pay bills, count change, handle a savings account, and use a checkbook. (Tr. 177). She had no difficulty with her attention span, could finish what she started, and followed written and spoken instructions without difficulty, but did not handle stress or changes in routine well. (Tr. 179-180).

Socially, Plaintiff went outside, read and watched television, and talked on the phone daily, and went to church once a week. (Tr. 178). She did not have problems getting along with family, friends, neighbors, or others. (Tr. 179).

Plaintiff filled out a Supplemental Function Questionnaire for fatigue on the same day. (Tr. 182). She noted that her fatigue began one (1) year prior when she was diagnosed with R.A. and Fibromyalgia. (Tr. 182). Her level of fatigue had decreased since its onset because she was not working or over-exerting herself.

(Tr. 182). Her fatigue was worse in the morning, and lasted all day due to her R.A. medication. (Tr. 182). Vitamin B-12 shots monthly and Vitamin D helped to relieve her fatigue for a few days. (Tr. 182). Her medications list included methotrexate, folic acid, Vitamin D, B-12 shots, Zoloft, and Norco. (Tr. 182).

Plaintiff also filled out a Supplemental Function Questionnaire for pain on the same day. (Tr. 183). She stated that her pain began in 2008, starting in her knees and progressing "all over." (Tr. 183). She rated her pain at a five (5) to ten (10), with it being "really bad" in her knees, and that she experienced shooting pain in her joint areas. (Tr. 183). Her pain had remained the same since it began, was located in all of her joints, and spread all over her body. (Tr. 183). Her pain was aggravated by cold temperatures, walking, bending, and standing, was worse at night, occurred daily, and lasted all day. (Tr. 183). She attributed a fifty (50) pound weight gain to her pain, and noted that she was taking Norco one (1) to three (3) times a day to relieve the pain. (Tr. 184). However, she also noted this medication did not cause any side effects. (Tr. 184).

At her oral hearing on April 2, 2013, Plaintiff testified that she was disabled due to R.A., degenerative joint disease of her left knee, Fibromyalgia, chronic fatigue, hypothryoidism, anxiety, depression, IBS, diverticulitis, and a hiatal hernia. (Tr. 50, 66, 68). Plaintiff stated that she lived in a house with her

6

husband, and that she had been a certified nurse's assistant for thirty-two (32)

years. (Tr. 52-53). Plaintiff stated that she had been terminated from her CNA

position at the Veterans Center due to time and attendance issues. (Tr. 54).

When questioned as to what limited her ability to work, Plaintiff stated that

it was due to her: (1) severe pain in her left knee; (2) pain in her hands, shoulders,

and joints; and (3) fatigue. (Tr. 55). She used a knee braced once a month for a

couple of days, but did not use a cane or walker. (Tr. 56). She had also undergone

knee injections, which she stated had worked but that she had not received in a

year, and was taking Oxycodone, prescribed by Dr. Eugene Grady, up to three (3)

times a day for pain, which she stated was doing a good job at controlling her knee

pain. (Tr. 57-59). Her knee last gave out on her a year prior to the hearing, which

caused her to injure her meniscuses. (Tr. 57). Activities that caused her knee pain

and swelling to worsen were housework, going up and down stairs, walking more

than short distances, (Tr. 57-60). She testified that she felt fine standing, and that

her left hip would hurt if she sat for more than about forty (40) minutes. (Tr. 60).

She also was able to engage in activities such as bending and kneeling, but if she

did them repetitively, she would be in pain and have to sit down. (Tr. 68-69).

Regarding her hands, Plaintiff testified that they would swell up, and

become tingly and numb, which made it difficulty for her to use her hands. (Tr.

60).  She also had pain in her left shoulder likely from Fibromyalgia that was never officially diagnosed.  (Tr. 63-64).  Plaintiff testified that she did not have limitations with regard to the objects or weight of things that she could lift and carry.  (Tr. 68).  Plaintiff stated that she was taking Methotrexate once a week for her R.A., which according to her, was "working."  (Tr. 64).  Plaintiff stated that "all the medication that I'm taking right now is, is helping."  (Tr. 64-65).

Regarding Plaintiff's IBS and Diverticulitis, Plaintiff testified that she had both good and bad days.  (Tr. 66).  On a really bad day, she would have "such severe abdominal paint that [it was] incapacitating."  (Tr. 67).  She stated that she had been taking Protonix to help with these conditions, and that for the six (6) months prior to the hearing, she had "been pretty good" with the IBS.  (Tr. 67).  She also testified that she had a hiatal hernia, which caused severe heartburn, but that it did not limit her ability to work.  (Tr. 68).

Plaintiff also discussed her obstructive sleep apnea that was causing difficulty sleeping falling asleep night.  (Tr. 69).  She testified that once asleep, she would stay asleep and sleep quite a bit.  (Tr. 69).  However, because of the sleep apnea, despite sleeping up to twelve (12) hours, she would feel like she did not sleep at all.  (Tr. 69).  Plaintiff therefore took naps during the day, sometimes napping all day a "couple times a week."  (Tr. 70).  She did not use the C-PAP

8

machine because it was uncomfortable, but was prescribed Provigil to help with the apnea. (Tr. 69).

Plaintiff also talked about her depression and anxiety. (Tr. 70). She stated that they caused an inability to focus and handle stress. (Tr. 70). It also made her want to stay in her pajamas and sleep. (Tr. 71).

In terms of activities of daily living, Plaintiff testified that she vacuumed, did the laundry, watched television, played with and walked her dog, and read. (Tr. 71-72). Socially speaking, she would go to church once a week, but not consistently every week, and did not engage in any other social activities. (Tr. 72).

## MEDICAL RECORDS

On March 9, 2012, Plaintiff underwent a sleep study at Regional Hospital of Scranton. (Tr. 265). She was diagnosed with mild sleep-disordered breathing, and it was recommended that Plaintiff undergo a repeat sleep study with titration of C-PAP to "resolve her underlying mild sleep-disordered breathing." (Tr. 265).

On April 3, 2012, Plaintiff underwent a Polysomnography with C-Pap titration. (Tr. 263). The Impression noted that Plaintiff had Obstructive Sleep Apnea Syndrome that was "effectively treated with C-PAP at 12 cm of water with heated humidity." (Tr. 263).

On April 3, 2012, Plaintiff had a follow-up appointment with Eugene Grady, M.D., the orthopedic specialist who had been treating her for several years for knee and joint pain, and who had diagnosed her before her alleged onset date with Fibromyalgia, chronic fatigue, Vitamin D and B12 insufficiency, suspected inflammatory polyarthritis, and left knee medial meniscus degeneration based on a prior MRI. (Tr. 281, 286, 288, 289). At this appointment, Plaintiff reported that she had generalized discomfort and stiffness, particularly in the morning upon waking up. (Tr. 291). Her medications included Methotrexate, Norco, Zoloft, folic acid, and Vitamin D. (Tr. 291). Her physical exam showed no objective palpable active warmth of any peripheral joints, warm extremities without edema, rashes, nodules, or lesions, and a normal sensory and motor examination neurologically speaking. (Tr. 291). Dr. Grady diagnosed Plaintiff with seronegative R.A. with a partial response to Methotrexate, persistent left knee pain, and Obstructive Sleep Apnea. (Tr. 291).

On April 17, 2012, Plaintiff underwent a consultative examination performed by Lee Besen, M.D. (Tr. 268). Her examination revealed she: was alert and oriented in three (3) spheres; had normal pulses and sensation; was able to dress herself and had intact dexterous movements; had no unusual skin disease; had a tender left knee but no effusion; had no active synovitis in her wrists or

10

fingers and had a grip strength of 3/5; had no active heat or synovitis in her elbows or ankles and had normal ankle and knee jerks; and had an antalgic gait with the ability to ascend on the table. (Tr. 269-270). Dr. Besen's impression was that Plaintiff had apparent R.A., possible Fibromyalgia secondary to R.A. or primary, a history of IBS, clinical depression with fatigue, acid reflux disease, a left knee structural abnormality, degenerative joint disease by history in multiple anatomic areas, chronic nicotine abuse, and a history of cervical cancer and tonsillectomy. (Tr. 270-271). In a Medical Source Statement completed that same day, Dr. Besen opined that Plaintiff could: (1) frequently lift and/ or carry up to ten (10) pounds; (2) sit for four (4) hours or less in an eight (8) hour workday; (3) engage in unlimited pushing and/ or pulling; and (4) occasionally bend, kneel, stoop, crouch, balance, and climb. (Tr. 272-273). Dr. Besen further opined that Plaintiff should avoid dust, fumes, odors, gases, and humidity. (Tr. 273).

On April 24, 2012, and June 1, 2012, Plaintiff had appointments with Peter Cognetti, M.D., who had been Plaintiff's treating physician since 2001. (Tr. 350, 352, 419). Her problems listed included: Vitamin D deficiency; Autoimmune disease, not elsewhere classified; anemia; anxiety; acute sinusitis; IBS, osteoarthrosis, unspecified, lower leg; knee pain; sleep disturbance, unspecified; and abdominal pain. (Tr. 350, 352). Her medications listed were: Hydrocodone;

Cephalexin; Aczone; Methotrexate; Desonide; Sertraline (Zoloft); Protonix;

Vitamin D; and Triamcinolone Acetonide. (Tr. 350-351, 353-354). Plaintiff's

physical exam was normal. (Tr. 351, 354). She was diagnosed with joint pain,

pain in her pelvic region in thigh, pernicious anemia, autoimmune disease (not

elsewhere classified), and a Vitamin D deficiency. (Tr. 351, 354).

On April 30, 2012, Paul Taren, Ph.D. performed a Psychiatric Review

Technique based on Plaintiff's medical records. (Tr. 89). He noted that Plaintiff

had Affective Disorder, and opined that she had moderate difficulty in maintaining

concentration, persistence, or pace, and mild restriction in activities of daily living.

(Tr. 89).

On May 1, 2012, Minda Bermudez, M.S. completed a Physical Residual

Functional Capacity form for Plaintiff. (Tr. 90). Dr. Bermudez opined that

Plaintiff could: (1) occasionally lift and/ or carry twenty (20) pounds; (2)

frequently lift and/ or carry ten (10) pounds; (3) stand and/ or walk for five (5)

hours; (4) sit for about six (6) hours; (5) engage in unlimited pushing and/ or

pulling within the aforementioned weight restrictions; (6) occasionally climb

ramps, ladders, and stairs and crawl; (7) frequently balance, stoop, and crouch; and

(8) never climb ropes or scaffolds. (Tr. 91-92). Dr. Bermudez also opined that

Plaintiff should avoid concentrated exposure to wetness, extreme cold, vibration,

and hazardous machinery. (Tr. 92).

On July 12, 2012, Plaintiff had an appointment with Dr. Heim. (Tr. 301). Plaintiff's diagnostic history dating back to 1977 included the following diagnoses: Leukocytosis; Essential Thrombocythemia, R.A; Vitamin B12 deficiency; Reflux Esophagitis; myalgia; Vitamin D deficiency; diverticulitis of her colon without hemorrhage; diaphragmatic hernia; carpal tunnel syndrome; malignant neoplasm of her face; generalized anxiety disorder; chronic depressive personality disorder; IBS; malignant neoplasm of the cervix; nasal cavity poly; eczema; and extrinsic asthma. (Tr. 301-302). The medications she was taking as of this appointment included: Phenobarbital; folic acid; Methotrexate; Norco; Vitamin D; and Zoloft. (Tr. 303). It was also noted that Plaintiff was terminated as a patient in 2011 due to treatment and appointment non-compliance. (Tr. 305).

On September 13, 2012, Plaintiff had an appointment with Dr. Cognetti for anxiety. (Tr. 520). Plaintiff was diagnosed with anxiety, essential hypertension, and osteoarthritis in his knee. (Tr. 522). Plaintiff was instructed to return to Dr. Cognetti's office on December 13, 2012. (Tr. 522).

On November 29, 2012, Plaintiff had an appointment with Dr. Cognetti for abdominal pain on her left side, nausea, and vomiting. (Tr. 523). Plaintiff's exam revealed lower left quadrant tenderness. (Tr. 526). Plaintiff was diagnosed with

13

abdominal pain, and Dr. Cognetti ordered blood work and a CT scan of her abdomen. (Tr. 526).

On November 29, 2012, Plaintiff underwent a CT scan of her abdomen and pelvis, which was ordered by Dr. Cognetti due to Plaintiff's complaints of abdominal and lower left quadrant pain. (Tr. 517). This scan revealed a small hiatal hernia, gallbladder sludge, and sigmoid diverticulosis, but there was no evidence of obstructive uropathy, appendicitis, or diverticulitis. (Tr. 517).

On February 20, 2013, Plaintiff had an appointment with Dr. Grady. (Tr. 417). It was noted that "[s]ince last seen, she actually is feeling much better now that she is not working. Particularly, her knees are doing better. She maintain methotrexate . . ." (Tr. 417). She was still have chronic reflux symptoms, but had no fevers, rashes, oral ulcerations, or infectious symptoms. (Tr. 417). Her medications at this appointment included Methotrexate, Oxycodone, Zoloft, folic acid, Vitamin D, and Prilosec. (Tr. 417). Her physical exam was completely normal. (Tr. 417). Dr. Grady's impression was that Plaintiff had seronegative polyarthritis most likely seronegative R.A. with a partial response to Methotrexate, Obstructive Sleep Apnea, and Fibromyalgia Syndrome. (Tr. 417). Provigil was added to Plaintiff's medications for her sleep apnea. (Tr. 417). Bloodwork was ordered, and Plaintiff was instructed to return for ana appointment in six (6)

14

months or sooner if needed. (Tr. 417-418).

On March 13, 2013, Plaintiff had a follow-up appointment with Dr. Cognetti. (Tr. 527). Plaintiff's exam revealed a normal gate and station and grossly intact sensation and cranial nerves. (Tr. 524). Plaintiff was diagnosed with unspecified hypothyroidism, autoimmune disease, not elsewhere classified, Vitamin D deficiency, and malaise and fatigue. (Tr. 524).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.");

15

Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance. Brown, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in

the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  <u>Mason</u>, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir.

1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. §

432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but

> cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy. Id. As part of step four, the Commissioner must determine the claimant's residual functional capacity. Id. If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled. Id. "The claimant bears the ultimate burden of establishing steps one

18

through four." Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996). A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule. The residual functional capacity assessment must include a discussion of the individual's abilities. Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity." Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December

19

31, 2016. (Tr. 13).  At step one, the ALJ found that Plaintiff had not engaged in

substantial gainful work activity from her alleged onset date of January 26, 2012.

(Tr. 13).

At step two, the ALJ determined that Plaintiff suffered from the severe[6]

combination of impairments of the following: "degenerative joint disease of the

left knee, seronegative inflammatory polyarthritis and fibromyalgia (20 C.F.R.

404.1520(c))."  (Tr. 13).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, and 404.1526).  (Tr. 15).

At step four, the ALJ determined that Plaintiff had the RFC  to perform light

work with limitations.  (Tr. 15).  Specifically, the ALJ stated the following:

After careful consideration of the entire record, the undersigned

_____

6.  An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,
sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An
impairment or combination of impairments is "not severe" when medical and other
evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's
ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

Case 3:15-cv-00256-WJN   Document 17   Filed 03/31/16   Page 21 of 26


> finds that [Plaintiff] has the [RFC] to perform light work as
> defined in 20 C.F.R. 404.1567(b). [S]he can lift and carry 20
> pounds occasionally and 10 pounds frequently. She can stand/
> walk for 6 out of 8 hours and sit for 6 out of 8 hours. She can
> occasionally bend, kneel, balance, stoop, squat, crawl and
> climb ramps and stairs. She cannot climb ladders, ropes or
> scaffolds. She can occasionally push/pull with her left lower
> extremity, including foot controls. She must avoid
> concentrated exposure to temperature extremes, wetness,
> vibration, unprotected heights and moving machinery. She can
> perform unskilled work that is not in fast-paced production
> environment. She needs a sit/stand option every half hour or so

(Tr. 15-16).

At step five of the sequential evaluation process, because Plaintiff could not

perform any past relevant work, and considering the her age, education, work

experience, and RFC, the ALJ determined "there are jobs that exist in significant

numbers in the national economy that the [Plaintiff] can perform (20 C.F.R.

404.1569 and 404.1569(a))." (Tr. 19-20).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined

in the Social Security Act at any time between January 26, 2012, the alleged onset

date, and the date of the ALJ's decision. (Tr. 21).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) the ALJ did not

consider Plaintiff's non-severe impairments when determining Plaintiff's RFC; (2)

the ALJ erred in finding Plaintiff to not be credible; (3) the ALJ erred in the weigh

he afforded to the medical opinion evidence. (Doc. 13, pp. 10-13). Defendant

disputes these contentions. (Doc. 14, pp. 5-23).

### 1.   <u>Medical Opinion Evidence</u>

Plaintiff asserts that the ALJ erred in the weight he afforded to the medical

opinions. (Doc. 13, pp. 11-13). More specifically, she argues that the ALJ erred

in giving little weight to the physicians that examined Plaintiff, but significant

weight to the "DDS medical consultant, who . . . did not examine the Plaintiff."

(<u>Id.</u>).

The preference for the treating physician's opinion has been recognized by

the Third Circuit Court of Appeals and by all of the federal circuits. <u>See</u>, <u>e.g.</u>,

<u>Morales v. Apfel</u>, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true

when the treating physician's opinion "reflects expert judgment based on a

continuing observation of the patient's condition over a prolonged time."

<u>Morales</u>, 225 F.3d at 317; <u>Plummer</u>, 186 F.3d at 429; <u>see also</u> 20 CFR §

416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you

and the more times you have been seen by a treating source, the more weight we

will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-

treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); Baker v. Astrue, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight.  Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted).  "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." In re Moore v. Comm'r of Soc. Sec., 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing Burnett v. Comm'r

of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000)).

The ALJ gave significant weight to the opinion of Dr. Bermudez because it was "consistent with the other evidence when considered in its entirety, including physical examinations by [Plaintiff's] treating physician." (Tr. 19).  The ALJ gave limited weight to the opinion of Dr. Taren because the psychologist did not examine Plaintiff and "there is no evidence of moderate limitations or a severe impairment." (Tr. 19).  The ALJ gave Dr. Besen's opinion limited weight because "it is not clear what his opinion is with regarding to walking/ standing limitations," "[t]here is nothing to support sitting limitations or the environmental limitations," and "his opinion is not consistent with or supported by the other evidence of record." (Tr. 19).  Dr. Cognetti's sole opinion that Plaintiff was incapacitated was given little weight because it was "not a full functional evaluation and the opinion is not consistent with or supported by other evidence." (Tr. 19).

In examining the weight the ALJ has afforded to these medical opinions, it is determined that while the ALJ gave limited weight to the opinion of Dr. Taren, the ALJ has failed to explain what medical opinion she relied on in determining Plaintiff's mental RFC because she did not give any significant or great weight to any medical opinion that provided mental health limitations contrary to the

opinion of Dr. Taren. Instead, the ALJ seemingly interpreted the medical evidence of record, and substituted her own opinion for that of a medical one in arriving at Plaintiff's mental RFC because Dr. Taren is the only physician who rendered any medical opinion as to Plaintiff's mental health limitations resulting from her impairments. The Third Circuit has repeatedly held that "an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and not due to his or her own credibility judgments, speculation or lay opinion." Morales v. Apfel, 225 F. 3d 310, 317-18 (3d Cir. 2000) (internal citations omitted); See Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) ("An ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting" the medical evidence.). Therefore, because the ALJ has apparently relied on her own substituted medical opinion in arriving at Plaintiff's mental RFC, substantial evidence does not support the ALJ's RFC finding. As such, remand is warranted, and thus the remaining issues raised in Plaintiff's complaint will not be addressed.

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence.

Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner for further proceedings.

A separate Order will be issued.

**Date**: March 31, 2016

/s/ **William J. Nealon**
**United States District Judge**

26